IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

IN THE MATTER OF THE SEARCH OF A
**TAN 2004 CHEVROLET SILVERADO
PICKUP, IDAHO LICENSE: AK9077B**.

Case No. 3:20-MJ-00596-MMS

 Dec 22 2020

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I**,** R. Allen Adair, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND DETECTIVE BACKGROUND

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of a **tan 2004 Chevrolet Silverado pickup truck, Idaho License:  AK9077B**  and the seizure of evidence, instrumentalities, and fruits of violations of Title 18 U.S.C. §922(g)(1), Title 18 U.S.C. §924(c)(1)(A), and Title 21 U.S.C. §841(a)(1).

2.  I am a Police Officer employed by the Municipality of Anchorage Police Department and am presently a Commissioned Police Officer in the State of Alaska.  Between May 2007 and April 2019, I was assigned to the Anchorage Police Department's (APD) Vice Unit.  My assignment with the Vice Unit focused on investigations related to prostitution, human trafficking and trafficking of controlled substances.

3.  I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. In April 2019, I was assigned to a task force position with the Bureau of Alcohol, Tobacco, Firearms, and Explosives.  My duties continue to focus on controlled substance and firearm related crimes impacting the Anchorage Community.


a) I have more than twenty-five years of combined law enforcement experience. I was an explosive and drug detector dog handler with the United States Air Force from June 1991 to August 1996. In August 1996, I was credentialed as a Special Agent with the Air Force Office of Special Investigations. In August 2004, I left active duty with the military and was employed with the Anchorage Police Department as an Officer. I retired from the Air Force Office of Special Investigations in May 2011.

b) I have graduated from three basic law enforcement academies. The first was the United States Air Force Police Academy in December, 1991. The second was the Air Force Office of Special Investigations Academy in November 1996 and the third was the APD Academy in January of 2005.

(c) During my tenure as a drug detector dog handler, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, and trafficking of controlled substances. This training also included the investigation of crimes involving the use, possession, and trafficking of controlled substances throughout the continental United States and military bases abroad.

(d) I attended and graduated from a six month special investigations academy operated by the Department of Defense. While attending this academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. This training predominately focused on the investigation of crimes involving the use, possession, manufacture and trafficking of controlled substances and the means by which to infiltrate and/or identify individuals and organizations involved in the use, possession, manufacture and trafficking of controlled substances.

(e) I attended and graduated from a five month police academy operated by APD. While attending APD's academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. In an extension of APD's academy, and subsequent to graduation from APD's academy, I received training and instruction from several APD



field training officers. This training included investigation of crimes involving the use, possession, manufacture, and trafficking of controlled substances in the Anchorage area.

(f) The majority of my police experience has been as a Special Agent assigned to various Joint Drug Enforcement Teams in Texas, California, and Alaska, followed by my tenure with APD's Vice Unit. My duties include watching for illegal activities, interviewing witnesses, victims and suspects, developing probable cause for cases, examining crime scenes in order to develop evidence to substantiate or disprove the allegation being investigated, handling and processing various types of evidence, utilizing human sources of information to resolve drug and other criminal related investigations, and assembling cases for possible prosecution by Federal, State, Municipal and Military Judicial Offices. In my law enforcement career, I have conducted hundreds of drug related investigations, involving the use, possession, manufacture, and trafficking of marijuana, lysergic acid diethylamide (LSD) cocaine hydrochloride, cocaine base (crack), heroin, ecstasy (MDMA), psilocybin mushrooms, methamphetamine, controlled prescription medication While conducting these investigations, I have interviewed several hundred people, involved either directly or indirectly with the crimes being investigated. I have also served or assisted in serving several drug related search warrants resulting in the seizure of the above mentioned drugs as well as firearms, ammunition, packaging materials, assorted concealment containers, cutting agents, digital and beam scales, cellular telephones, surveillance systems, marijuana grow operations, methamphetamine laboratories, cameras, body armor, memory cards, computers and related equipment, various electronic equipment purchased with illicit proceeds, documents, money, precious metals, gems, stolen property, address books, and assorted paraphernalia utilized to ingest controlled substances.

(g) Based on my training and experience, I know people involved in the use, possession, manufacture, and/or drug trafficking of controlled substances commonly possess and use cellular telephones, standard telephones, and computers to facilitate these activities. Regarding cellular telephones in particular, I know drug traffickers will use cellular telephones to facilitate their activities because of the mobility offered by cellular telephones. Further, drug traffickers are attracted to cellular telephones because they enable suspects to avoid the risks attendant with operating from a fixed location.


Additionally, cellular telephones afford spontaneous access to drug customers and to drug sources.

(h) Based on my training and experience, I know people involved in the use possession, manufacture, and/or trafficking of controlled substances commonly engage in these activities at all hours of the day and night.

(i) Based on my training and experience, I know people involved in the use, possession, manufacture, and/or trafficking of controlled substances commonly generate and retain documentary and/or electronic evidence of these activities, to include, but not limited to, receipts, writings memorializing illegal drug transactions, weights, money paid, wired, transferred, deposited, received, and owed, as well as customer/source lists, including names, addresses, and telephone numbers. Further, I know that these documents and/or electronic evidence are often retained long after the transactions to which they refer have taken place, and that these documents and/or electronic evidence are often retained in the residences and vehicles of people involved in these activities, as well as in places where these activities take place.

(j) Based on my training and experience, I know that trafficking of controlled substances is a cash business, and frequently very lucrative. Also based on my training and experience, I know that people involved in the possession, manufacture, and/or trafficking of controlled substances commonly possess money generated by these activities. It is also common for these people to attempt to conceal the illicit source of their proceeds by concealing the money in safe deposit boxes, or depositing the funds into one or more financial institutions. It is also common place for these people to possess stolen property accepted in exchanges for controlled substances. Further, based on my training and experience, I know that people involved in the use, possession, manufacture, and/or trafficking of controlled substances maintain and possess firearms to protect themselves, their controlled substances, and their trafficking proceeds. Further, I know that the above described documents, money, stolen property, and firearms are commonly found in the vehicles and residences of drug traffickers, as well as in other places maintained for the trafficking of controlled substances, as well as lower profile locations sometimes referred to as "stash houses."


(k) Based on my training and experience, I know people involved in the use, possession, manufacture, and/or trafficking of controlled substances commonly use or alter various items to conceal controlled substances and/or proceeds from drug sales to include, but not limited to: "Stash cans" resembling day to day consumable items, eye glass cases, curling irons, camera cases, key ring fobs, film canisters, books, binders, hidden compartments within residences and/or vehicles. These items/locations may be basic in design, to those that are extravagantly engineered and/or operated electronically/hydraulically.

(l) Based on my training and experience, I know people involved in the use, possession, manufacture, and/or trafficking of controlled substances frequently fail to report their proceeds from illicit drug transactions on their tax returns and often violate provisions of Title 18, United States Code, Section 1956 (Domestic Money Laundering) by continuing to promote their illicit drug transactions from the proceeds of their drug sales and concealing the source of their proceeds.

(m) Based on my training and experience, I know that it is common for people encountered at places maintained for trafficking purposes, and/or within vehicles used for trafficking purposes to have the following items on their persons: illegal drugs, proceeds from illegal drug sales, documentary evidence, and cell phones.

(n) Based on my training and experience, I know people involved in the use, possession, manufacture, and/or trafficking of controlled substances commonly take measures insulate/distances themselves from their illicit activities, as well as the instruments used therein, to include premises, vehicles, firearms, and telephones. These measures include the use of real or fictitious nominees for transactions and activities which require the presentation of identification. Examples of these measures include: the use of premises rented, owned, or maintained by others (to include the use of others in opening utility accounts); the use of cellular telephones held in another's name; the use of others to ship and/or receive money and/or controlled substances; the use of others to purchase and/or store firearms, and the use of others to directly interact with the drug customers during the transactions. These measures also include the use of vehicles rented or owned by others, as well as the failure to transfer the title to newly purchased vehicles from the previous owner to the trafficker or even a nominee.


(o) Based on my training and experience, I know that cameras (still and video) found in places and vehicles maintained for trafficking activities commonly contain evidence of these activities, to include images and recordings of people involved in these activities, images of firearms used in these activities, images of controlled substances, and images of drug trafficking proceeds, and further that these images are often retained long after the images are captured. Further, I know individuals involved in the manufacture and trafficking of controlled substances utilize closed circuit and remote camera surveillance systems to monitor approaches to the locations where these activities are conducted.

(p) Based on my training and experience, I know that the items identified under the "Conclusion" section of this affidavit are frequently found in residences and/or vehicles maintained for the use, possession, manufacture, and trafficking of controlled substances.

(q) I received an associate in applied science, criminal justice degree from the Community College of the Air Force in 2004. I have attended the following courses to supplement training I received while attending the previously mentioned law enforcement academies:

i. Department of Justice Operation Jetway Course, July 2018
ii. DEA Social Media for Investigation Course, April 2018
iii. FLETC Single Officer Response to an Active Threat, June 2018
iv. DEA Social Media for Investigation Course, July 2014
v. DEA Narcotic Management and Leadership Course, October 2012
vi. DEA Prescription Drug Diversion Investigations Course, August 2012
vii. DEA Drug Interdiction Course, September 2011
viii. Investigating Drug Trafficking Organizations Course, August 2011
ix. DEA Basic Drug Investigations Course, August 2010
x. Mid-Level Narcotic Investigation Course, June 2010
xi. DEA Indoor Marijuana Cultivation Investigations Course, July 2008
xii. International Money Laundering Investigations, July 2008
xiii. National Center for Missing and Exploited Children, Protecting Victims of Child Prostitution, January 2008
xiv. DEA Controlled Substance Concealment Course, January 2008
xv. Anchorage Police Department Crime Scene Processing Course, November 2004
xvi. Anchorage Police Department Patrol Officer Academy, August 2004
xvii. DoD Polygraph Institute Credibility Assessment through Linguistic Analysis, April 2002
xviii. Heinz Laboratories National Clandestine Drug Labs Course, January 2001
xix. AFOSI Protective Service Operation Course, August 2000
xx. USMC Urban/Rural Sniper/Counter-Sniper Training, January 2000
xxi. AFOSI Counterintelligence and Force Protection Operations Course, November 1999


| | |
|---|---|
| xxii. | AFOSI Evidence Custodian Training Course, May 1999 |
| xxiii. | Practical Homicide Investigation Course, February 1999 |
| xxiv. | Advanced Reid Technique of Interviewing and Interrogation, July 1998 |
| xxv. | AFOSI Advanced Special Investigators Course, July 1998 |
| xxvi. | AFOSI Forensics Course, October 1997 |
| xxvii. | AFOSI Special Investigators Course, December 1996 |
| xxviii. | Reid Technique of Interviewing and Interrogation, October 1996 |
| xxix. | Investigative Skills for Street Gangs, March 1996 |
| xxx. | Texas A & M Investigative Skills Course, November 1995 |
| xxxi. | USAF Explosive and Drug Detector Dog Handler Course, March 1992 |
| xxxii. | USAF Patrol Dog Handler Course, October 1991 |
| xxxiii. | USAF Law Enforcement Specialist Course, September 1991 |

## LOCATION AND VEHICLE ASSOCIATED WITH THIS REQUEST

4. The **tan 2004 Chevrolet Silverado pickup truck, Idaho License: AK9077B** is currently located within the Anchorage Police Departments secured storage area in the vicinity of 4501 Elmore Road, Anchorage, Alaska.

## LIMITED NATURE OF AFFIDAVIT

5. I have participated in the investigation of the offenses set forth above. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from local law enforcement officers and information obtained from the analysis of reports. All observations referenced in this affidavit that were not made by me were related to me by the person who made such observations. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements. I have not set forth each and every fact learned during the course of this investigation. I have set forth only those facts which establish the foundation for probable cause.

## PROBABLE CAUSE

6. In November 2020, Investigators with the Anchorage Police Department and Bureau of Alcohol, Tobacco, Firearms, and Explosives began an investigation involving a criminal organization operating in Anchorage and Nevada. The organization identified themselves as



"PMM" (Players Making Moves).  The investigation identified Samuel Frederick DAVIS (DOB: 9/2/1992, FBI #: 206143MD0) as the leader of the organization operating from Nevada with strong prior ties to the Anchorage community.  Of the nearly 6-10 additional members of "PMM", Investigators identified convicted felon, Kyin Andre SUMPTER-BOYD (DOB: 10/28/1996, FBI #: 951819CH7) as an Anchorage based resident and associate of DAVIS.  The criminal investigation and reviews of social media postings by SUMPTER-BOYD confirmed he is engaged in distribution of heroin and prescription medication supplied by DAVIS.  A video recording on social media in the later part of November 2020 depicts SUMPTER-BOYD in possession of three handguns that are consistent with the Glock manufacturing company.  SUMPTER-BOYD is holding two handguns in his right hand and one in his left hand.  One of the pistols in his right hand is equipped with a high-capacity drum magazine.  The pistol in his right hand is a compensated Glock with a green laser type light.  Examination of the handguns depicted in the social media video posted by SUMPTER-BOYD are consistent with actual pistols and not replicas.  A query of SUMPTER-BOYD's criminal convictions in Alaska indicate he was previously convicted of felony assault with a weapon in 2016, thus making him prohibited from possessing concealable firearms in Alaska.  During prior Law Enforcement contact since SUMPTER-BOYD's felonious assault conviction, he acknowledged he was prohibited from possessing firearms.

a)  Investigation over the course of the previous month, identified SUMPTER-BOYD was residing at 259 Zappa Place, Anchorage, Alaska.  The specific unit was not initially known to Investigators.

b)  A review of https://hotpads.com/259-zappa-pl-anchorage-ak-99504-1mbrf58/d/pad depict the interior of 259 Zappa Place, #D, Anchorage, Alaska.  The open source photograph depicts the kitchen area of Unit #D.  The unique characteristics of the photograph are the two differing kitchen lights and the upper kitchen cupboards.  The light fixtures and cupboards are consistent with the light fixtures and cupboards depicted in SUMPTER-BOYD's social media video posts.

c)  On December 2nd, 2020, Investigators located a tan 2004 Chevrolet pickup, Idaho License:  AK9077B, associated with SUMPTER-BOYD, parked outside 259 Zappa



Place.  Periodic surveillance has routinely placed the vehicle at the Zappa address and varying hours of the day and evening.

d)   On December 7th, 2020, SUMPTER-BOYD posted a social media video of an individual holding a Hi-Point handgun.  Investigators believe SUMPTER-BOYD authored the video as it was posted on his social media account.

e)   On December 11th, 2020, Investigators intercepted a parcel DAVIS mailed from Nevada to Anchorage.  The subsequent search warrant execution of the parcel disclosed approximately three kilograms of heroin bound for Anchorage.  This seizure further corroborated DAVIS' connection to his Anchorage based associates engaged in controlled substance and firearm related crimes impacting the Anchorage community.

f)   On December 12th, 2020, SUMPTER-BOYD posted a video recording inside a residence, believed to be 259 Zappa Drive, #D.  The video portrays the packaging of suspected illicit controlled tablets.  The video recording is followed by a posting, "Fuvk it who need M promise I'm have the lowest price 6est deal".  The "M" designator identified by SUMPTER-BOYD in the social media offering is consistent with illicit fentanyl laced tablets being sold in Anchorage.  The investigation has determined SUMPTER-BOYD and his associates are routinely engaged in illicit sales of opioid based prescription medication via social media.  This has become an increasingly common method of sales within the Anchorage area.

g)  Based on the aforementioned information, coupled with information gleaned from Anchorage Police Officer Seth McMillan's investigation, linking SUMPTER-BOYD to 259 Zappa Place, #D, a State of Alaska search warrant was sought and received for the search of the Zappa address for the presence of controlled substances, associated paraphernalia and documents, firearms and related accessories.  The warrant was issued on December 12th, 2020 and assigned number: 3AN-20-4699SW.

7. On December 13th, 2020, Officers with the Anchorage Police Department's (APD) Investigative Support Unit (ISU), followed SUMPTER-BOYD from 259 Zappa Place.  SUMPTER-BOYD was operating the **tan 2004 Chevrolet Silverado pickup truck, Idaho**



**License: AK9077B**. He was accompanied by his girlfriend, Alyson Maree WILSON (DOB: 12/5/1999, Alaska Driver's License: 7636062). The duo drove to 8100 Boundary, where they picked up 15 year old JH. The trio drove to the Fred Meyer grocery store, located at 7701 Debarr Road, Anchorage, Alaska. Detective Allen Adair, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), Task Force Officer requested APD ISU Officers contact SUMPTER-BOYD and JH in connection with the above mentioned investigation. Officer McMillan was dressed in plain clothing and followed SUMPTER-BOYD into the grocery store. Officer McMillan noted SUMPTER-BOYD was carrying a heavy object in the right front pocket of his jacket consistent with a handgun based on how the item caused the front of SUMPTER-BOYD's jacket to "sag".

a)      Officers contacted SUMPTER-BOYD, WILSON, and JH outside the grocery store. SUMPTER-BOYD attempted to flee on foot after Officers identified themselves. He surrendered only after he realized he was surrounded. After being placed in handcuffs, SUMPTER-BOYD and JH told Officers they were armed. Officers recovered a loaded Glock, Model 17C, 9mm, pistol, Serial Number: AABT687, with an extended magazine loaded with (29) assorted 9mm cartridges from SUMPTER-BOYD's right front jacket pocket. A loaded Glock, Model 29, 10mm, pistol, Serial Number: XEF550 was seized from JH. During the subsequent mirandized interview of SUMPTER-BOYD by Detective Adair, he admitted to being previously convicted of felony assault with a weapon and acknowledged he was prohibited from possessing a firearm. SUMPTER-BOYD admitted to possessing the pistol located in his front jacket pocket and went on to discuss his involvement with DAVIS' drug trafficking enterprise. SUMPTER-BOYD admitted the search of his home would disclose approximately 600-800 fentanyl laced Percocet tablets he was selling on behalf of DAVIS for $12.00 per tablet. SUMPTER-BOYD's admission was consistent with information investigators previously received.

b)      SUMPTER-BOYD admitted to routinely possessing a firearm after his felony conviction because he was previously involved in a shooting where he was struck multiple times. SUMPTER-BOYD denied possessing a firearm in furtherance of his illicit drug sales. The search of SUMPTER-BOYD's residence disclosed assorted rifle and handgun


ammunition, a drum magazine for a 9mm pistol, loaded with (52) cartridges, assorted other pistol magazines, and in excess of 750 tablets suspected to be the fentanyl laced Percocet referenced by SUMPTER-BOYD during his interview.

## **CONCLUSION**

8. Based upon my training and experience, I know that pursuant to Title 18 U.S.C. §922(g)(1) that it is unlawful for any person who has knowingly been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year, to possess in or affecting commerce, any firearm or ammunition; Title 21 U.S.C. §841(a) states that it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance.  I also know that pursuant to Title 18 U.S.C. §924(c)(1)(A) it is unlawful for any person during and in relation to a drug trafficking crime to use or carry a firearm in furtherance of any such crime.

9.  Based upon the aforementioned information, I believe that probable cause exists that the **tan 2004 Chevrolet Silverado pickup truck, Idaho License: AK9077B**, contains evidence, instrumentalities, and fruits of violations of Title 18 U.S.C. §922(g)(1), Title 18 U.S.C. §924(c)(1)(A), and Title 21 U.S.C. §841(a)(1).

10.  Based on the foregoing, your affiant is requesting that a search warrant be granted for the **tan 2004 Chevrolet Silverado pickup truck, Idaho License: AK9077B**, referenced in this affidavit (**Attachment A**) and there is probable cause to believe Kyin Andre SUMPTER-BOYD is in violation of Title 18 U.S.C. §922(g)(1), Title 18 U.S.C. §924(c)(1)(A), and Title 21 U.S.C. §841(a)(1).

11. Specifically, I request authorization to search for, and seize, the items listed in **Attachment B**.

Respectfully submitted,

_____

R. Allen Adair
Detective, Bureau of Alcohol, Tobacco, Firearms and Explosives / Anchorage Police Department Task Force

Subscribed and sworn to before me
on December 16, 2020:

_____
Matthew M. Scoble, United States Magistrate Judge